People v Machia (2022 NY Slip Op 03942)

People v Machia

2022 NY Slip Op 03942

Decided on June 16, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 16, 2022

111533
[*1]The People of the State of New York, Respondent,
v
Christopher J. Machia, Appellant.

Calendar Date:April 28, 2022

Before:Egan Jr., J.P., Clark, Reynolds Fitzgerald, Fisher and McShan, JJ.

Thomas F. Garner, Middleburgh, for appellant, and appellant pro se.
Susan J. Mallery, District Attorney, Howes Cave (Kevin P. Mallery of counsel), for respondent.

Fisher, J.
Appeal from a judgment of the County Court of Schoharie County (Bartlett III, J.), rendered July 18, 2018, upon a verdict convicting defendant of the crimes of criminal sexual act in the first degree and endangering the welfare of a child.
Defendant was charged by a 26-count indictment with crimes related to his sexual abuse of a minor (hereinafter the victim). Following a jury trial, defendant was convicted of one count each of criminal sexual act in the first degree and endangering the welfare of a child. County Court sentenced defendant to a prison term of 12 years, to be followed by 20 years of postrelease supervision, for his conviction of criminal sexual act and to a lesser concurrent term on his remaining conviction. Defendant appeals.
We affirm. Defendant argues that the jury verdict is not supported by legally sufficient evidence and is against the weight of the evidence. However, defendant's legal sufficiency challenge is unpreserved as he failed to make a motion for a trial order of dismissal at the close of all proof (see People v Abreu, 195 AD3d 1152, 1153 [2021], lvs denied 37 NY3d 1144 [2021]). Nevertheless, in the course of reviewing defendant's challenge to the weight of the evidence, "we necessarily determine whether all of the elements of the charged crimes were proven beyond a reasonable doubt" (People v Barzee, 190 AD3d 1016, 1017 [2021] [internal quotation marks and citations omitted], lv denied 36 NY3d 1094 [2021]). "When conducting a weight of the evidence review, this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Cummings, 188 AD3d 1449, 1450 [2020] [internal quotation marks and citations omitted], lv denied 36 NY3d 1096 [2021]; accord People v Hansel, 200 AD3d 1327, 1328 [2021], lv denied 38 NY3d 927 [2022]). A weight of the evidence review further requires us to "consider the evidence in a neutral light and defer to the jury's credibility assessments" (People v Brisman, 200 AD3d 1219, 1219 [2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1159 [2022]).
As relevant here, "[a] person is guilty of criminal sexual act in the first degree when he or she engages in . . . anal sexual conduct with another person . . . [b]y forcible compulsion" (Penal Law § 130.50 [1]). Within the context of sex offenses, forcible compulsion "means to compel by either . . . use of physical force; or . . . a threat, express or implied, which places [the victim] in fear of immediate death or physical injury" (Penal Law § 130.00 [8] [a], [b]; see People v Garrand, 189 AD3d 1763, 1764 [2020], lv denied 36 NY3d 1120 [2021]). Forcible compulsion is examined through the victim's state of mind, and relevant factors include the victim's age, his or her relative [*2]size and strength compared to the defendant and the relationship between the defendant and the victim (see People v Hartle, 159 AD3d 1149, 1152 [2018], lv denied 31 NY3d 1082 [2018]; People v Robinson, 156 AD3d 1123, 1126 [2017], lv denied 30 NY3d 1119 [2018]). "A person is guilty of endangering the welfare of a child when . . . [h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than [17] years old" (Penal Law § 260.10 [1]).
The victim testified that, in April 2016, she was 13 years old and moved into a rental property with her mother, great-grandmother and two brothers. The victim explained that her great-grandmother owned several rental properties in the immediate vicinity around her residence, including one across the street that was rented to defendant. The victim testified that she first met defendant in May 2016 when he had presented himself at her residence with his rental payment for the great-grandmother. The victim further explained that defendant had asked her mother whether the victim would be interested in providing child care for his three children throughout the summer of 2016. The victim testified that she agreed to babysit defendant's children overnight while he was at work and until he got home, which could be anywhere between 2:00 a.m. and 5:00 a.m. She admitted that she used defendant's computer to access social media websites, with his permission, and she also stated that defendant had multiple cameras set up around his residence that were being monitored on a television set in his bedroom. According to the victim, defendant began abusing her during the third day of babysitting when he began with inappropriate kissing, and such abuse graduated to defendant "becoming more handsy." She also testified that defendant began using a fake Facebook account under the name of "Kayden James" to send her messages, including asking her to be "more fun or sexual" by performing oral sex on him or engaging in vaginal intercourse.
The victim testified that, in July 2016, defendant came home from work, forced her into his bedroom and performed oral sex on her. She testified that defendant continued to perform oral sex on her, touch her, digitally penetrate her and kiss her on a weekly basis in his bedroom. The victim testified that this conduct continued to escalate and, in August 2016, defendant came home from work drunk and — after she declined to go into his bedroom — defendant "got forceful and grabbed [her] wrist and dragged [her] into the bedroom," "pushed [her] onto the bed and held [her] hands above [her] head." The victim averred that defendant "had his knees pushing against [the victim's] thighs so that [she] couldn't move" and then "attempted vaginal sex" but she resisted. She contended that defendant became frustrated and "wound up . . . doing anal sex" without a condom and after applying a lubricant to himself. The victim testified that she told defendant [*3]that she "didn't want to do it" and that defendant responded she would be "okay as long as [she] was quiet." The victim further testified that, after he finished, she grabbed her clothing and returned home. According to the victim, defendant texted her to apologize for "coming off forceful or aggressive" and asked whether she had used the bathroom afterwards. The victim contended that defendant began to give her gifts, including rings — one of which defendant called an "engagement ring" — which he kept in a small, black box in his bedroom.
The victim claimed that defendant forcefully engaged in anal sex with her on three occasions, including by pinning her down or tying her hands together above her head. The victim recalled that, when she tried to get away from defendant on one of those occasions, "[h]e grabbed [her] arm and pulled [her] back and told [her] that if [she] didn't like it the way he did then [she] needed to start to or he would tell and [she] would get taken away." The victim testified that she had been frightened by this encounter and explained that she did not disclose the abuse earlier because defendant threatened to send her mother, who was on probation, to jail. He also threatened to cause harm to the victim's great-grandmother.
Several other fact witnesses testified, including multiple members of law enforcement who recovered text message conversations between defendant and the victim. This included the conversation where defendant told the victim that he "felt bad" for being "forceful," and then a subsequent message asking the victim whether she went "to the bathroom" afterwards to "get me out of you." Law enforcement also recovered a black box from defendant's bedroom and observed a television that was set up as a "monitoring screen." An investigator testified that, during the execution of a search warrant on defendant's residence, defendant's cell phone was repetitively dinging, which defendant explained was set up to alert him to "capture whatever Facebook messages that [the victim] would send and/or receive." According to the investigator, defendant expressed his belief that he had a "legal right" to do this because the victim "logged into his computer at his residence."
Defendant also testified at trial, denying that he ever forced himself on the victim, struck her or engaged in any sexual activity with her. Defendant further denied that he purchased an "engagement ring" for the victim, but admitted he had purchased her other rings that she had "expressed interest" in and some other gifts. He also admitted that he had cameras in his residence and that the television was set up in his bedroom for monitoring to protect himself from allegations by his estranged spouse. However, defendant did not know who Kayden James was or why that profile appeared on his cellphone. Defendant also contended that the text messages recovered by law enforcement came from his second cell phone that was set up as a "hotspot" [*4]and could not send SMS messages, therefore he denied sending those messages.
Although a contrary verdict would not have been unreasonable had the jury credited defendant's testimony, "the victim was extensively cross-examined regarding the incidents and her account was not contradicted by any compelling evidence and was not so unworthy of belief as to be incredible as a matter of law" (People v Maisonette, 192 AD3d 1325, 1327 [2021] [internal quotation marks, brackets and citations omitted], lv denied 37 NY3d 966 [2021]; see People v Butkiewicz, 175 AD3d 792, 793 [2019], lv denied 34 NY3d 1076 [2019]). "As to the element of forcible compulsion, the existence of an implied threat is established by a subjective inquiry into what a victim feared a defendant might have done if he or she did not comply" (People v Garrand, 189 AD3d at 1767 [internal quotation marks, brackets and citations omitted]). Moreover, the victim's testimony that defendant did, in fact, use physical force (i.e., his body weight and extremities) to pin her down and otherwise restrain her is sufficient to satisfy the element of forcible compulsion (see Penal Law § 130.00 [8] [a]; People v Blackman, 90 AD3d 1304, 1306-1307 [2011], lv denied 19 NY3d 971 [2012]). To that extent, and "tak[ing] into consideration the young age of the victim, her relative size and strength compared to the adult defendant, defendant's close relationship to the victim and position of trust and authority," and mindful that "forcible compulsion is not synonymous with violence," we find the verdict convicting defendant of criminal sexual act in the first degree to be supported by the weight of the evidence (People v Hartle, 159 AD3d at 1152 [internal quotation marks and citations omitted]; see People v Maisonette, 192 AD3d at 1327; People v Robinson, 156 AD3d at 1126). "As to endangering the welfare of the child, the nature of defendant's conduct, his request that the victim keep it a secret" and his threats to the victim "establish that he was aware that his conduct may likely result in harm to [the victim]" (People v Cummings, 188 AD3d at 1454 [internal quotation marks, brackets and citations omitted]). Accordingly, "[v]iewing the evidence in a neutral light and deferring to the jury's credibility assessments," we find that the verdict on the engendering count "is amply supported by the weight of the evidence" (People v Johnson, 183 AD3d 77, 87-88 [2020], lv denied 35 NY3d 993 [2020]; see People v Garrand, 189 AD3d at 1767; People v Saxe, 174 AD3d 958, 960 [2019]).
Next, defendant contends that he was not afforded meaningful representation for several reasons. "In order to sustain a claim of ineffective assistance of counsel, a court must consider whether defense counsel's actions at trial constituted egregious and prejudicial error such that the defendant did not receive a fair trial" (People v Campbell, 196 AD3d 834, 838 [2021] [internal quotation marks, brackets and citations omitted], lvs denied [*5]37 NY3d 1025 [2021]; see People v Smith, 193 AD3d 1260, 1267 [2021], lv denied 37 NY3d 968 [2021]). In examining "whether a defendant has been deprived of effective assistance, a court must examine whether the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Sposito, 37 NY3d 1149, 1150 [2022] [internal quotation marks and citations omitted]; see People v Davis, 200 AD3d 1200, 1207 [2021]). "The burden is on the defendant to demonstrate the absence of strategic or other legitimate explanations for counsel's choices" (People v White-Span, 182 AD3d 909, 915 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1071 [2020]; see People v Green, 190 AD3d 1094, 1100-1101 [2021], lv denied 36 NY3d 1097 [2021]).
Defendant asserts that counsel was ineffective for his purported waiver or forfeiture of a Huntley hearing. The record reflects that counsel initially requested a Huntley hearing in defendant's omnibus motion but, prior to such a hearing, conceded to the admissibility of the statement in question. As a result, County Court determined that a Huntley hearing was no longer necessary. We find no error with this waiver and stipulation to the admissibility of defendant's statement to law enforcement as a "review of the trial evidence reveals that it is unlikely that a suppression motion, if [not withdrawn], would have been successful" (People v Spencer, 169 AD3d 1268, 1271 [2019], lvs denied 34 NY3d 935, 938 [2019]; see People v Hall, 147 AD3d 1151, 1152 [2017], lv denied 29 NY3d 1080 [2017]; see generally People v Aldrich, 243 AD2d 856, 857 [1997], lv denied 91 NY2d 888 [1998]). Similarly, in light of our determination that defendant's conviction is not against the weight of the evidence (see People v Saunders, 176 AD3d 1384, 1391 [2019], lv denied 35 NY3d 973 [2020]; People v Barzee, 190 AD3d at 1017), defendant's argument that defense counsel was ineffective because he failed to make a motion for a trial order of dismissal is without merit since "[c]ounsel will not be found to be ineffective on the basis that he or she failed to make an argument or motion that has little or no chance of success" (People v Brown, 169 AD3d 1258, 1260 [2019] [internal quotation marks and citation omitted], lv denied 33 NY3d 1029 [2019]; see People v Bombard, 187 AD3d 1417, 1420 [2020]). We further reject defendant's contention that he received ineffective assistance of counsel based upon his trial counsel's opening and closing statements (see People v Damon, 200 AD3d 1323, 1326 [2021]; People v Lafountain, 200 AD3d 1211, 1216 [2021], lv denied 38 NY3d 951 [2022]). Considering that defense counsel obtained an acquittal on 24 counts, when "[v]iewed as a whole, the trial record reveals that defendant received meaningful representation" (People v Johnson, 183 AD3d at 91; see People v Campbell, 196 AD3d [*6]at 839; People v Porter, 184 AD3d 1014, 1019-1020 [2020], lv denied 35 NY3d 1069 [2020]).
We further reject defendant's claim that the sentence imposed was harsh and excessive. Although, as defendant contends, his presentence investigative report reveals no substantial criminal history and that he has a low risk of recidivism, that does not detract from the serious nature of the offense or the significant impact that defendant's actions had on the victim (see People v Johnson, 183 AD3d at 91; People v Hartle, 159 AD3d at 1155; People v Kalina, 149 AD3d 1264, 1267-1268 [2017], lv denied 29 NY3d 1092 [2017]). Inasmuch as the sentence imposed fell toward the middle of the sentencing range (see Penal Law §§ 70.02 [3] [a]; 70.45 [2-a] [f]; 130.25 [1]), we do not find the sentence to be unduly harsh or severe (see CPL 470.15 [6] [b]).
Egan Jr., J.P., Clark, Reynolds Fitzgerald and McShan, JJ., concur.
ORDERED that the judgment is affirmed.